# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | NONGUIDELINE MISDEMEANOR |
| ) | PRESENTENCE INVESTIGATION REPORT |
| ) | |
| ) | |
| ) | Docket No.:   0090 1:23CR00134-001 |
| Stacey Stephens ) | |
| ) | |

**Prepared for:**   Tanya S. Chutkan
United States District Court Judge

**Prepared by:**   Macy Mullins
United States Probation Officer
219-852-3642
macy_mullins@innp.uscourts.gov

**Assistant U.S. Attorney**
Douglas Spencer Meisel
145 N Street NE, Suite 2300
Washington DC, DC 20530
202-598-2281
douglas.meisel@usdoj.gov

**Defense Counsel**
Thomas Brooke Howard II
7 Hotel Street
Warrenton, VA 20186
540-422-0100
tbh@hhlawva.com

**Sentence Date:**   October 2, 2023, at 10:00 AM

**Offense:**   **Count 4**:
Parading, Demonstrating, or Picketing in a Capitol Building
40 U.S.C. § 5104(e)(2)(G), 40 U.S.C. § 5109(b)
Not more than 6 months imprisonment/$5,000 fine
(Class B Misdemeanor)

**Release Status:**   Arrested on March 29, 2023, in Broad Run, Virginia. Issued a personal recognizance bond at initial appearance held on March 30, 2023, in the United States District Court for the District of Columbia.

**Detainers:**   None.

**Codefendants:**   None.

**Related Cases:**   None.

**Date Prepared:**   August 25, 2023     **Date Revised:**   September 21, 2023

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | August 12, 1966 |
| **Age:** | 57 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Female |
| **SSN#:** | 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 |
| **FBI#:** | R56AKHLNK |
| **USM#:** | 51561-510 |
| **State ID#:** | DC761101 |
| **Marital Status:** | Widowed |
| **Education:** | Master's Degree |
| **Dependents:** | 0[1] |
| **Citizenship:** | U.S. Citizen |
| **Country of Birth:** | United States |
| **Primary Language:** | English |

PACTS#: 8602063

**Legal Address:** 5142 Fairview Lane, Broad Run, Virginia 20137
**Residence Address:** 5142 Fairview Lane, Broad Run, Virginia 20137
**Telephone#:**

**Alias(es):** True Name: Stacey Lynn Stephens
Also Known As: Stacey Lynn Cooney, Stacey Lynn Carpenter-Cooney
Nee (Maiden Name): Stacey Lynn Carpenter

**Alternate IDs:** PACTS#: NDIN 7403734

**Restrictions on Use and Redisclosure of Presentence Investigation Report.** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

---

[1] Based on IRS Publication 501 definition for dependent(s) to include qualifying child or relative. All identified children, whether or not a dependent of the defendant, are included in Part C of this report.

**PART A. THE OFFENSE**

    **Charge(s) and Conviction(s)**

1. On March 24, 2023, The United States Attorney for the District of Columbia filed a four-count Complaint charging Stephens with Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. § 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(G). An Information charging Stephens with the same charges was filed on April 24, 2023.

2. The Information does not provide notice to the defendant the Government intends to seek forfeiture as a part of the sentence.

3. The criminal conduct charged in the Information occurred on or about January 6, 2021.

4. On June 26, 2023, the defendant pled guilty to one count of the four-count Information pursuant to a written plea agreement. Count 4 charged Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), 40 U.S.C. § 5109(b). The following sentencing related agreements made between the parties are contained in the plea agreement: the defendant understands the charge to which she pled guilty carries a maximum sentence of six months imprisonment, a term of probation of not more than five years, a fine of not more than $5,000, and a $10 special assessment; the "Statement of Offense" accurately describes Stephen's involvement in the offense; the defendant agrees to allow law enforcement to conduct an interview regarding the events in and around January 6, 2021; Stephens will not be further prosecuted criminally for the conduct in the Statement of Offense and the Government will request the Court dismiss the remaining counts of the Information at the time of sentencing; the United States Sentencing Guidelines do not apply to this class B misdemeanor; the Court is not bound by the plea agreement provisions; Stephens agreed to waive her rights conferred by 18 USC § 3742; Stephens agrees to pay restitution to the Architect of the Capitol in the amount of $500; the defendant agrees to submit a complete, accurate, and truthful financial statement to the Financial Litigation Unit of the United States Attorney's Office; and the defendant authorizes the United States Attorney's Office to obtain a credit report.

5. On March 30, 2023, the defendant was issued a personal recognizance and, on the same date, the Court issued Conditions of Release requiring her to report for supervision to Pretrial Services in Washington, DC; surrender any passport; not obtain a passport; stay away from D.C. except for Court proceedings, meetings with counsel, and required PSA business; not possess a firearm or other weapon; report law enforcement contact; notify Pretrial Service of any travel outside the State of Virginia; receive Court approval before travel outside of the Continental United States; and verify her address with Pretrial Services.

6. Pretrial services records indicate the defendant has complied with all Court ordered conditions of release.

**The Offense Conduct**

**The Attack on the U.S. Capitol on January 6, 2021**

7. The United States Capitol, which is located at First Street, SE, in Washington, DC., is secured 24 hours a day by United States Capitol Police. Restrictions around the US Capitol include permanent and temporary security barriers and posts manned by US Capitol Police. Only authorized people with appropriate identification are allowed access inside the US Capitol.

8. On January 6, 2021, the exterior plaza of the US Capitol was closed to members of the public.

9. On January 6, 2021, a joint session of the United States Congress convened at the US Capitol, which is located at First Street, SE, in Washington, DC. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the US Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

10. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the US Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the US Capitol building, and US Capitol Police were present and attempting to keep the crowd away from the US Capitol building and the proceedings underway inside.

11. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the US Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by US Capitol Police Officers or other authorized security officials.

12. At such time, the certification proceedings were still underway, and the exterior doors and windows of the US Capitol were locked or otherwise secured. Members of the US Capitol Police attempted to maintain order and keep the crowd from entering the US Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the US Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the US Capitol, requiring the expenditure of more than $2.8 million dollars for repairs.

13.     Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the US Capitol, including the danger posed by individuals who had entered the US Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the US Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

**Stephens Participation in the January 6, 2021, Capitol Riot**

14.     On January 6, 2021, at approximately 2:50 p.m., Stephens was part of a mob that had gathered on the Upper West Terrace of the U.S. Capitol outside the Senate Wing doors.

15.     At that time, several Capitol police officers stood inside the Senate Wing door entrance, verbally confronted by rioters. Stephens was present as members of the mob ignored the line of officers and pressed forward inside the U.S. Capitol.

16.     Once inside the Capitol, Stephens proceeded south toward the Crypt. She spent approximately 15 minutes inside the Capitol, exiting via the Senate Wing doors at 3:05 pm.

17.     On August 10, 2022, Stephens was interviewed by Special Agents assigned to the FBI Washington Field Office and admitted that she and her mother, Linda Carpenter, went to see President Trump speak at the National Mall on January 6, 2021. Stephens, a white female with light-colored hair, stated that she wore red, white, and blue and wore a wool Trump hat and a red "Trump 2020" scarf. During the interview, Stephens confirmed what she was wearing by viewing a photo shown to her by the Agents.

**Elements of the Offense**

18.     Stacey Stephens knowingly and voluntarily admits to all the elements of 40 U.S.C. § 5104(e)(2)(G) which makes it a crime to willfully and knowingly parade, demonstrate, or picket in any of the Capitol Buildings. Specifically, Stephens admits that she willfully and knowingly entered the U.S. Capitol Building knowing that that she did not have permission to do so. Stephens further admits that while inside the Capitol, she willfully and knowingly paraded, demonstrated, or picketed.

**Codefendant**

19.     None.

**Related Cases**

20.     None.

### Victim Impact

21. In consideration of 18 USC § 3663 and 18 USC § 3663A, the Court is authorized to impose restitution under the terms of a plea agreement. This offense involved a large crowd of individuals who gathered outside the US Capitol, some of whom ultimately forced entry inside the building. Those individuals' actions included, but are not limited to, breaking windows, damaging property, and assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The incident resulted in substantial damage to the US Capitol, requiring the expenditure of approximately $2,923,080.05 in repairs, as of July 7, 2023. In this case, the defendant has agreed to pay $500 toward restitution, payable to the Architect of the Capitol.

### Defendant's Statement

22. No further statement was provided by the defendant.

### Offense Level Computation

23. Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

24. None.

### Adult Criminal Conviction(s)

25. None.

### Criminal History Computation

26. Pursuant to USSG §1B1.9, the sentencing guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

### Other Criminal Conduct

27. None.

### Pending Charges

28. None.

### Other Arrests

29. None.

**PART C. OFFENDER CHARACTERISTICS**[2]

### Current Personal and Family Data

30.  Stacey Lynn Stephens (nee: Carpenter) was born August 12, 1966, in Orange, California, to the marital union of Linda Snell and Francis Carpenter, as verified by State of California Department of Public Health records. She was raised by both parents until they separated when she was eight years old. Her parents' separation was "bitter" from her recollection. Her father maintained a presence in her life, on weekends, for a short period of time before he remarried and moved to Northern California. She then saw her father on a yearly basis and advised she never shared a close relationship with her father after that time.

31.  Stephens was raised by a single mother who provided the basic life necessities. She was raised in safe, middle-class neighborhoods in Orange County, California. Her mother worked as a radiology technician. While she was at work, Stephens and her younger brother would be cared for by their grandmother, neighbor, or family friend. On some occasions, the children had to accompany their mother to work. Her mother never remarried but had shared a ten-year relationship with Donald Mode. Mode served as a father figure to Stephens; she recalled he helped her with her college courses and taught her to hunt and fish. Stephens denied exposure to any form of abuse throughout her upbringing.

32.  The defendant's brother, Jason Carpenter, age 52, resides in Idaho. The siblings maintain monthly contact. Stephens has two paternal half-siblings with whom she does not share a relationship. She continues to maintain yearly contact with her father. Stephens' mother, Linda, passed away in February 2022. She resided at the defendant's home and assisted with taking care of the horses on the property. She passed after she fell in the barn and was found by Stephens. This was a particularly difficult loss as she shared a close relationship with her mother who she described as her best friend.

33.  Stephens has twice married. Her prior eight-year marriage to Sean Cooney produced no children. She wed her husband, Stephen Larry Stephens, in 2005. In January 2022, Mr. Stephens was diagnosed with Stage IV kidney cancer. Doctors predicted he had a seven percent chance of living one year. The cancer continued to spread despite two rounds of chemotherapy, and he now also suffers from adrenal cancer. He participated in a clinical trial for treatment, though he passed away on September 5, 2023. His passing has significantly impacted Stephens and his daughters. Stephens described her husband as a strong man, though his treatment and ailments required her to assist him with daily tasks and doctor visits until his passing. Mr. Stephens has one daughter, Julie Stephens, age 25, from a prior relationship. The couple obtained guardianship of his sister's daughter, McKenzi Golden, age 18, in February 2022 seven months after she began residing with the couple. Stephens considers McKenzi her foster daughter. McKenzi was described as "fragile." Her mother was a heroin user throughout her childhood which resulted in McKenzi living with other family members then being sent to a "troubled child" home in

---

[2] Information provided in Part C of the PSR was obtained from an interview with the defendant. The presentence interview was conducted telephonically with defense counsel participating. The information contained in Part C was verified by her brother unless otherwise noted. Third party records could not be requested due to a lack of signed releases of information.

Utah before being placed with Stephens and her husband. When McKenzi arrived to Stephens' care, she was on a medication regimen consisting of 36 pills for what they were told was bipolar I disorder. Stephens and her husband obtained a separate mental health evaluation for McKenzi which concluded that she experienced behavioral and emotional concerns but provided no formal diagnosis. Further counseling services were unsuccessful. Instead, Stephens observed McKenzi's mental health significantly improve the longer she was at the home with her, noting she believed providing a loving, relaxed household was more beneficial than any medication or therapy services that were previously provided. Stephens shares close relationships with both children. She advised there was a period where her husband and children were upset with her due to the instant case, but they have since become supportive of her.

34. Stephens resides with her daughter McKenzi at 5142 Fairview Lane in Broad Run, Virginia. An inquiry of the Fauquier County records confirms the home is owned by the defendant and her late husband who purchased the residence in 2012. The over five-acre property includes the home, which is a 6 bedroom, 3.5 bathroom single story with a basement. There are two outbuildings on the property, both utilized for horse purposes. A home assessment revealed the defendant's residence appears suitable for supervision purposes.

### Physical Condition

35. The defendant is 5 feet, 3 inches tall and weighs 145 pounds. She has brown hair and hazel eyes. The following tattoos were reported: a panda and cherry blossom on her right abdomen, a heart on her neck, and Winnie the Pooh on her left hip.

36. Stephens is in overall good health. She reported being diagnosed with atopic dermatitis on her foot which causes itching. She has been prescribed opzelura 1.5% cream which she noted has been the only prescription medication that she has tried that has helped mitigate the symptoms. Stephens advised she was diagnosed with trigeminal neuritis a few years ago and was prescribed Zoloft. She took the medication once then never used it again.

### Mental and Emotional Health

37. Stephens reported experiencing a particularly high level of stress due to a combination of circumstances that have occurred over the last 18 months, namely her husband's cancer diagnosis, her mother passing, her sister-in-law passing of cancer, and the instant case. She has not sought any therapy our counseling services and does not believe it is necessary. Rather, she has utilized coping mechanisms on her own and relies on her faith to carry on. Stephens reported still feeling stressed at this time. She was previously prescribed Zoloft for stress over ten years ago, though she took the medication for only four days then ceased due to negative side effects. She has no interest in prescription medications for mental health treatment.

### Substance Abuse

38. No illicit substance use nor treatment for such was reported. She is a social alcohol consumer.

### Educational, Vocational and Special Skills

39. Stephens earned her Master of Business Administration in 2006 from the University of Phoenix Online as confirmed by her diploma. Her baccalaureate studies at Vanderbilt University pertained to molecular biology. She earned her Bachelor of Science in 1987 according to her diploma. She also attended law school for three semesters and advised she did well, but she did not enjoy mock trials, so she ceased the education.

### Current Employment Status

40. Stephens has been employed as a senior compliance and privacy analyst at Availty based out of Jacksonville, Florida, since September 2018. She earns $133,000 yearly in this capacity. Stephens explained her work involves software security for the United States Department of Veterans Affairs. Her work is almost entirely conducted remotely. Prior to this role, she worked in project management for two companies from 2013 to 2018.

41. In addition to her fulltime employment as an analyst, Stephens runs an equestrian business, Reining in Color Farm, which she operates out of her home. Stephens expressed she used the funds that would have gone towards law school tuition and bought her first horse, which began her passion as an equestrian. Stephens previously participated in horse shows and rode horses three times weekly, though she no longer has adequate time to tend to the horses as much as she did previously due to familial responsibilities.

### Social Media

42. Stephens advised she uses social media (FaceBook, X, Truth Social, and Instagram) for both personal and business purposes. She is more active on social media promoting her equestrian business than her personal account, which she utilizes mostly to view other's posts.

### Financial Condition: Ability to Pay

43. Stephens provided the following financial information. The estimated value of the defendant's home was derived from Fauquier County records.

#### Assets

| | | |
|---|---|---|
| Personal Checking Account | Bank of Clarke | $45,000.00 |
| Retirement Account | | $200,000.00 |
| Residence | 5142 Fairview Lane | $702,600.00 |
| Vehicle | 2016 Ford F350 | Unspecified |
| Vehicle | 2012 Mini Cooper | Unspecified |
| Vehicle | 2009 Adam Horse Trailer | Unspecified |
| **Total Assets** | | **$947,600.00** |

### Liabilities

| | | |
|---|---|---|
| Mortgage | 5142 Fairview Lane | $359,825.92 |
| Vehicle | 2016 Ford F350 | $39,000.00 |

**Total Liabilities**                                                       $398,825.92

**Total Net Worth**                                                         $548,774.08

### Monthly Income

| | |
|---|---|
| Salary | $6,500.00 |
| Business Income | $400.00 |

**Total Monthly Income**                                      $6,900.00

### Monthly Expenses

| | |
|---|---|
| Home/Mortgage | $2,789.55 |
| Property Taxes | $140.00 |
| Groceries and Supplies | $600.00 |
| Utilities | $507.00 |
| Telephone | $310.00 |
| Cable | $155.00 |
| Auto Loan Payment | $732.00 |
| Commuting Expenses | $200.00 |
| Auto Insurance | $400.00 |
| Medical Expenses | Unknown |
| Credit Card | $1,500.00 |

**Total Monthly Expenses**                                   $7,333.55

**Total Monthly Cash Flow**                                  ($433.55)

### Analysis

44. The information contained in the Net Worth Statement (dated July 19, 2023) was obtained from the defendant. Independent research was conducted through an automated credit report (Equifax). An Equifax report dated August 23, 2023, revealed the following accounts with balances: one Redstone Federal credit card with a balance of $1,060; one auto loan from Redstone Federal with a balance of $38,783; a real estate mortgage from JP Morgan Chase Bank with a balance of $358,552; a JP Morgan Chase credit card with a balance of $2,071; and a Citibank credit card with a balance of $395.

45. The defendant has agreed to pay restitution in the amount of $500. Should the Court impose a fine it should consider the defendant's familial responsibilities to include the recent passing of her husband and her 18-year-old foster daughter, McKenzi.

**PART D. SENTENCING OPTIONS**

### Custody

46. **Statutory Provisions:** The maximum term of imprisonment is six months. 40 U.S.C. § 5104(e)(2)(G) and 40 U.S.C. § 5109(b).

47. **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

### Supervised Release

48. **Statutory Provisions:** Pursuant to 18 USC §§ 19 and 3583(b)(3), this offense of conviction meets the definition of a "petty offense," consequently, a term of supervised release is not applicable.

49. **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

### Probation

50. **Statutory Provisions:** The defendant is eligible for up to five years probation because the offense is a misdemeanor. 18 U.S.C. § 3561(c)(2).

51. **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

### Conditions of Supervision

52. The following conditions listed in the most recent revision of the Judgment in a Criminal Case (Form AO 245B), establish the basic expectations for an individual under supervision, identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvement in the conduct and condition of the person under supervision, as required under 18 USC § 3603. These conditions are reasonably related to the sentencing factors set forth in 18 USC § 3553(a)(1) and (a)(2)(B), (C), and (D); such conditions involve no greater deprivation of liberty that is reasonably necessary for the purposes set forth in § 3553(a)(2)(B), (C), and (D); and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to 28 USC § 994a.

    1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, or within 72 hours of release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4. You must answer truthfully the questions asked by your probation officer.

5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

11. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

12. You must follow the instructions of the probation officer related to the conditions of supervision.

53. In addition to the mandatory and discretionary conditions of supervision, 18 USC § 3563(a) and (b), the Court may impose other conditions as they relate to the nature and circumstances of the offense and the history and characteristics of the defendant. 18 USC § 3553(a)(1).

54. In consideration of the above, the Court may impose all or a combination of the following additional conditions: (a) payment of restitution as provided under the terms of the plea agreement.

55. The Probation Office researched available programs within the Bureau of Prisons; however, the defendant's personal history does not support the need for transitional services while incarcerated.

### Mandatory Drug Testing

56. The Violent Crime Control and Law Enforcement Act of 1994 requires an individual under supervision, whose offense occurred after September 13, 1994, refrain from the unlawful use of a controlled substance; submit to one drug test within fifteen days of the commencement of supervision; and two additional periodic drug tests. The condition for mandatory drug testing may be ameliorated or suspended by the Court if reliable sentencing information indicates a low risk of future substance abuse by the defendant. 18 USC §§ 3563(a)(5) and 3583(d).

### Fines

57. **Statutory Provisions:** The maximum fine is $5,000. 18 U.S.C. § 3571(b).

58. A special assessment of $10 is mandatory. 18 U.S.C. § 3013.

59. **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

60. In determining the fine amount, the Court shall consider, among other factors, the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence. 18 USC § 3572(a)(6) and USSG §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests that the Court use a monthly cost of $3,688 for imprisonment, a monthly cost of $2,980 for community confinement, and a monthly cost of $371 for supervision.


### Restitution

61. **Statutory Provisions:** Pursuant to 18 USC § 3663(a)(3), restitution in the total amount of $500 shall be ordered in this case. Restitution, as set forth below, shall be paid to the Clerk of the Court for the United States District Court, District of Columbia, who shall forward the payments to:

| Victim Name | Amount of Loss |
|---|---|
| Architect of the Capitol<br>Office of the Chief Financial Officer<br>Ford House Office Building, Room H2-205B<br>Washington, DC 20515 | $500.00 |

62. **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

### PART E. SENTENCING FACTORS

63. Pursuant to 18 USC § 3553(a), the Court shall impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense; to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational/vocational training, medical care or other correctional treatment.

Respectfully Submitted,

**BRIAN D. SHAFFER**
**CHIEF UNITED STATES PROBATION OFFICER**

By:    s/Macy Mullins

Macy Mullins
United States Probation Officer
219-852-3642


Approved:

s/Jaime A. Klopfenstein        Date: 09/21/2023

Jaime A. Klopfenstein
US Probation Officer
219-852-3663

**ADDENDUM TO THE PRESENTENCE REPORT**
**UNITED STATES V. STACEY STEPHENS**
**DOCKET NO.: 0090 1:23CR00134-001**

**DISCLOSURE AND OBJECTION CHRONOLOGY**

The presentence report was disclosed to counsel on August 25, 2023. Pursuant to the Court's Sentencing Order and/or Federal Rules of Criminal Procedure, Rule 32(e), the parties were required to submit any objections to the presentence report by September 8, 2023.

**OBJECTIONS**

By the Government
The Government did not file objections to the presentence report.

By the Defendant
The defendant and Defense Counsel did not file objections to the presentence report.

Supplemental Information by the Probation Office
The presentence report, specifically Part C, was updated to include information obtained since the filing of the draft presentence report. The total loss amount as a result of the damage incurred by the US Capitol was also updated under the Victim Impact section.

Respectfully Submitted,

**BRIAN D. SHAFFER**
**CHIEF UNITED STATES PROBATION OFFICER**

By:   s/Macy Mullins

Macy Mullins
United States Probation Officer
219-852-3642


APPROVED BY:

s/Jaime Klopfenstein

Jaime A. Klopfenstein          Date: 09/22/2023
US Probation Officer
219-852-3663