**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-134 (TSC)** |
| **v.** | : | |
| | : | |
| **STACEY STEPHENS** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Stacey Stephens to 14 days' intermittent confinement as a condition of a 36-month term of probation, 60 hours of community service, and $500 restitution.

## I.     Introduction

The defendant, Stacey Stephens ("Stephens"), a 57-year-old woman, employed as a senior compliance and privacy analyst, traveled from her home in Broad Run, Virginia to participate in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Stephens pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a term of incarceration is appropriate in this case because she was among a wave of rioters that helped sustain and prolong the continued assault on the U.S. Capitol.

The Court must also consider that Stephens' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed to delay the certification vote.   Shortly after Capitol police successfully resecured the Senate Wing Door, at approximately 2:47 p.m., rioters violently reestablished the breach. Stephens entered via the Senate Wing Door at approximately 2:50 p.m., proceeding in the direction of the Crypt, and spent approximately 15 minutes inside the building before exiting. Prior to her arrest, she agreed to be interviewed and, though she admitted to entering the U.S. Capitol, she minimized and attempted to justify her actions by claiming that she was simply following and protecting her now-deceased elderly mother.  Therefore, she did not then, and has not since, genuinely expressed sincere remorse for her criminal conduct on January 6. Consequently, the facts and circumstances of Stephens' conduct support a sentence of 14 days' intermittent confinement as a condition of a 36-month term of probation, 60 hours of community service, and $500 restitution.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 13 (Statement of Offense), at ¶¶ 1-7.

### *Defendant Stephens's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Stephens traveled to Washington, D.C., from her home in Broad Run, Virginia with her now-deceased mother, to attend the "Stop the Steal" rally.

After attending the former President's rally at the Ellipse, Stephens and her mother joined the crowd advancing on the U.S. Capitol.  They approached the U.S. Capitol from the west front and massed with other rioters on the Upper West Terrace.

At approximately 2:35 p.m., dozens of Capitol Police officers had resecured the Senate Wing Door and were escorting rioters outside the building, while scores of rioters remained massed just outside, yelling, chanting, and verbally confronting the officers inside. See Exhibit 1 – USCP CCTV, starting at 2:35 p.m. At approximately 2:44 p.m., Capitol police had successfully removed the last of the rioters from the area, and the Senate Wing Door remained secured. From the doors and windows, rioters continued to threaten reentry and continued verbally confronting the officers inside. Id. from 2:44 p.m. - 2:47 p.m. At approximately 2:47 p.m., rioters started hurling themselves over a make-shift barricade blocking the door, attempting to break through the Capitol Police defensive line and reopen the breach. Id. at 2:47 p.m. Approximately one minute later, the defenders were forced to yield under unrelenting pressure of the mob and flooded through the Senate Wing Door.



*Images 1 and 2: Screenshots from open-source video; Stephens entering the Senate Wing Door*

Once the breach was reestablished, rioters freely flowed in through the door and adjacent windows. Id., starting at 2:47 p.m. Stephens and her mother were just outside the Senate Wing Door as the breach was happening; she could likely hear the crowd repeatedly chanting "U.S.A."; she likely could hear the slamming of the Senate Wing Door as rioters attempted to remove them from their hinges; and Stephens stood facing toward the Parliamentarian door, holding her phone up as if recording the simultaneous breach of that entry point. See Exhibit 2 – Open-source video.[2] At approximately 2:50 p.m., Stephens and her mother followed the unyielding mob into the U.S. Capitol via the Senate Wing Door. Dozens of U.S. Capitol police stood helplessly at the entry, overwhelmed by the mob, verbally confronted by many, and ignored by others. Stephens and her mother were likely accompanied by Dona Sue Bissey, 21-cr-165 (TSC).[3]

---

[2] In this 6 minute, 48 second video, Stephens can be seen at 00:40 and 00:51.

[3] Like Stephens, Dona Sue Bissey pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. *United States v. Bissey*, 21-cr-165 (TSC). Bissey wrote in a Facebook post which included a photograph of an older female, "This is Our Warrior Linda. We stayed with her and her daughter Stacey all day. They are somewhat locals. When we Marched to [the] Capitol she said 'I'm going in' and she lead [sic] the way." Id. at 4. Through investigation and social media analysis, "Stacey" has since been identified as Stacey Lynn Stephens, 23-cr-134 (TSC). Bissey and Stephens are seen together in multiple open-source images. See e.g., Image 3 and 7 below. This Court sentenced Bissey to 14 days' incarceration.



*Image 3: Bissey Facebook post; Stephens in the upper left, Bissey on the right*



*Image 4: Still from USCP CCTV; Stephens entering the Senate Wing Door*



*Image 5: Still from USCP CCTV; Stephens entering via Senate Wing Door*

Stephens and her mother proceeded toward the Crypt, likely turning back before they reached it, and returned to the Senate Wing Door approximately 15 minutes later, exiting at 3:05 p.m.



*Images 6: Still from USCP CCTV; Stephens exiting via Senate Wing door*

*Stephens's Post-arrest Interview with the FBI*

On August 10, 2022, Stephens gave a pre-arrest interview to the FBI. During the interview, she admitted traveling to Washington, D.C. with her mother to see the former President speak on the National Mall on January 6, 2021.

Stephens stated that she and her mother traveled to Washington, D.C., via the metro. She stated that she was dressed in red, white, and blue, wearing a wool Trump hat and a red "Trump 2020" scarf. Stephens identified herself in a photograph presented by the agents, depicting her on or near the Capitol grounds and inside the U.S. Capitol on January 6, 2023.



*Image 7: Open-source image presented to Stephens during pre-arrest interview[4]*

Stephens sought to excuse her conduct, claiming that she entered the U.S. Capitol to protect her elderly mother, to make sure she would remain safe among the crowd. She said she and her mother were inside the U.S. Capitol for approximately five minutes.

*The Charges and Plea Agreement*

On March 24, 2023, the United States charged Stephens by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 30,

---

[4] *Note*: Dona Sue Bissey (21-cr-165) depicted on the right in the gray sweatshirt.

2023, Stephens was arrested by law enforcement agents without incident. On April 24, 2023, the United States charged Stephens by a 4-count Information with violating the same four statutes. On June 26, 2023, pursuant to a plea agreement, Stephens pleaded guilty to Count 4 of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Stephens agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   Statutory Penalties

Stephens now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Stephens faces up to six months of imprisonment and a fine of up to $5,000. Stephens must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C.  § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days' intermittent confinement as a condition of a 36-month term of probation, 60 hours of community service, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Stephens's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Stephens, the absence of violent or destructive acts is not a mitigating factor. Had Stephens engaged in such conduct, he would have faced additional criminal charges.

Some of the most important factors in Stephens' case is that her entry helped to sustain and prolong the continued assault on the U.S. Capitol, prevent officers from reestablishing safety and security. Only minutes earlier, Capitol police had painstakingly resecured the Senate Wing Door, were in the process of removing the remaining rioters from that area of the Capitol. At approximately 2:47 p.m., the mob violently reopened the breach, hurling themselves at the Capitol police defensive line, using flags as weapons, slamming the doors to remove them from their hinges, while Stephens and her mother reinforced the mob, contributed to the overwhelming numerical overmatch, and reestablished the breach.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14 days' incarceration in this matter.

### B.  The History and Characteristics of Stephens

As set forth in the PSR, this offense represents Stephens' first arrest and conviction. ECF 14 ¶ 24-29. Stephens is a 57-year-old female with a master's degree in business administration. ECF 14 ¶ 39. Since 2018, Stephens has been employed as a senior compliance and privacy analysis with a company based Jacksonville, Florida. ECF 14 ¶ 40. Stephens also runs an equestrian business which she operates out of her home. Id.

Stephens is obviously well-educated and professionally accomplished. In this case, her inexplicable conduct demonstrates a very real need for specific deterrence in the form of some period of incarceration.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-cr-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. The gravity of these offenses demands deterrence. There is possibly no greater factor that this Court must consider.

10

*Specific Deterrence*

As with other defendants who made the decision to unlawfully enter the Capitol during a riot, Stephens knowingly and willfully entered immediately following a violent re-breach, then spent approximately 15 minutes inside the building during that riot. She has not expressed remorse for her conduct, but instead has sought to excuse and minimize her conduct as justified to protect her mother, and not necessarily motivated by her desire to disrupt the certification proceedings. Incarceration is warranted in this case to promote the goal of specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Stephens based on her own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: her participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the

spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

As noted above in footnote 2, Dona Sue Bissey pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). Bissey likely entered the U.S. Capitol via the Senate Wing Door at or around 2:50 p.m. and remained inside the Capitol for approximately 10 minutes.[6]  Like Stephens, Bissey remained inside the Capitol for a short period of time. Bissey was active on social media; her posts regarding the events of January 6 were exuberant and celebratory. Consequently, this Court doubted her later expressions of remorse, and sentenced Bissey to 14 days' incarceration. 22-cr-165 (TSC).

---

[6] The time and location of Bissey's entry were unclear from the complaint and attached affidavit. *See* 21-cr-165 (TSC), ECF No. 1. However, as discussed above in footnote 2, it's likely that her entry was at or near the same time as Stephens' and Carpenter's entry.

Nicholas Lattanzi pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). Lattanzi, like Bissey, was active on social media, announcing his planned trip to D.C. on TikTok and posting selfies with fellow rioters at the "Stop the Steal" rally.  Lattanzi entered the U.S. Capitol via the Senate Wing Door at approximately 3:22 p.m., carrying a white flag. Lattanzi remained inside the Capitol for only 5 minutes, far less than Stephens. Lattanzi lied in his initial post-arrest interview, denying that he entered the Capitol, but through his attorney requested a second interview in which he amended his previous statement, acknowledging his entry and describing the circumstances. Though Stephens admitted to her entry and participation, she did not accept of responsibility for committing a crime, but instead sought to justify her conduct by claiming to protect her elderly mother. At the time, Stephens' mother was then clearly healthy enough to march from the Ellipse to the Capitol, ascend the West Front stairs to the Upper West Terrace, all while shoulder to shoulder with scores of violent rioters. This Court sentenced Lattanzi to 14 days' incarceration. 22-cr-028 (TSC).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

In this case, the government submits that a sentence of 14 days' intermittent confinement as a condition of a 36-month term of probation, would not create an "unwarranted disparity" with the sentences imposed in those cases because of the similar factors in this case.[7]

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

---

[7] Section 18 U.S.C. § 3563(b)(10) authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently approved two weeks of imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least eight of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Stephens must pay $500 in restitution, which reflects in part the role Stephens played in the riot on January 6. Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Stephens' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 61.

**Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Stephens to 14 days' intermittent

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

confinement as a condition of a 36-month term of probation, 60 hours of community service, and

$500 restitution. Such a sentence protects the community, promotes respect for the law, and deters

future crime by imposing restrictions on his liberty as a consequence of his behavior, while

recognizing his acceptance of responsibility for his crime.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    s/ *Douglas Meisel*
DOUGLAS MEISEL
NY Bar No. 4581393
Trial Attorney (Detailee)
U.S. Attorney's Office
601 D. Street, N.W.
Washington, D.C.  20530
douglas.meisel@usdoj.gov
(202) 923-7821

</div>